Fouad ABU LABAN and Mohamed Abu Laban, Petitioners,

v.

Charles SAVA, District Director, New York District, U.S. Immigration and Naturalization Service, Respondent.

No. 82 Civ. 7105 (RWS).

United States District Court, S.D. New York.

December 20, 1982.

Omar Z. Ghobashy, New York City, for petitioners.

John S. Martin, Jr., U.S. Atty., S.D.N.Y., New York City, for respondent; Michael D. Patrick, Asst. U.S.Atty., New York City, of counsel.

## OPINION

SWEET, District Judge.

Petitioners Fouad Abu Laban and Mohamed Abu Laban (collectively "Abu Labans"), two excludable Palestinian aliens from Syria who have been detained since September 17, 1982 by the Immigration and Naturalization Service ("INS"), seek a writ of habeas corpus pursuant to 28 U.S.C. § 2241. The Abu Labans seek release from detention pending the adjudication of their respective applications for political asylum.

1. Section 101(a)(15)(C) of the Act, 8 U.S.C. § 1101(a)(15)(C), provides in pertinent part:
   (15) The term "immigrant" means every alien except an alien who is within one of the following classes of nonimmigrant aliens—
   . . . . .
   (C) an alien in immediate and continuous transit through the United States . . .

2. Under Section 238(d) of the Act, 8 U.S.C. § 1228(d), the Attorney General is authorized by Congress to
   enter into contracts including bonding agreements with transportation lines to guarantee the passage through the United States in immediate and continuous transit of aliens destined to foreign countries.

This action was commenced by order to show cause on October 27, 1982. The habeas jurisdiction of this court encompasses the jurisdiction to review parole decisions of the District Director of the INS. *Bertrand v. Sava,* 684 F.2d 204 (2d Cir.1982). For the reasons set forth below, the Abu Labans' application for a writ of habeas corpus is denied.

The Government, on behalf of respondent Charles Sava, District Director, New York District, INS, has submitted affidavits of six INS officials who have been involved in the Abu Labans affair. The following facts are set forth in those affidavits.

Abu Labans arrived with their father at JFK International Airport from Madrid, Spain on August 13, 1982 seeking temporary entry to the United States as tourists en route to Mexico. Lacking valid, unexpired immigrant visas, Abu Labans and their father arrived as nonimmigrants[1] and requested the privilege transitting the United States without visas, commonly referred to as "TRWOV" status.[2] Immigration Inspectors examined their travel papers and found that the day before they had been denied immigrant visas to enter the United States by the American Consulate in Madrid. A search of their luggage revealed New York contacts but no tourist paraphernalia concerning Mexico. TRWOV privileges as travelers were denied as the Inspectors concluded that the Abu Labans and their father were not in *bona fide* transit to Mexico. The airline that brought them to the United States was directed to

Pursuant to this authority, certain regulations have been promulgated which specify, *inter alia,* that aliens seeking TRWOV status must establish their admissibility to the United States, that they be *bona fide* travelers in transit, with confirmed and onward reservations to at least the next country beyond the United States, and that they continue their journey within eight hours after their arrival or on the first available transport. 8 C.F.R. §§ 212.-1(e)(1), 214.2(c)(1) (1982). *See generally* 1 C. Gordon & H. Rosenfield, *Immigration Law and Procedure,* § 2.9b at 2–69—2–73 (Rev. ed. 1982) (hereinafter cited as *"Immigration Law and Procedure"*).

return them to their point of embarkation on the next available flight which was scheduled to leave several hours later.

Prior to departure, the father, who appeared to have suffered a heart attack, collapsed in the airport and was taken to Jamaica Hospital by ambulance. Rather than return the Abu Labans to Madrid without their father, the Service decided to release them on humanitarian grounds for one week. The next morning, the Service called the hospital to inquire about the father's condition and was told that he had been discharged the night before, a few hours after he came in. His collapse had apparently been caused by a fainting spell.

Several days later, counsel for the Abu Labans submitted a formal request to the Service for extensions of parole due to the "critical condition" of the father. Attached to the letter of request was a short, handwritten note from a physician in Jersey City, New Jersey, Dr. F.L. Al-Salihi, indicating that the father had hypertension and diabetes, was on medication and required bed rest for three months. The Service, concerned about the authenticity of the father's condition and skeptical of the family's intentions, requested a complete typewritten medical report on the father and that the Abu Labans appear at the New York office for questioning. Despite requests made by the District Director's Office, the Abu Labans refused to appear voluntarily, and the medical report was never submitted. During the following weeks, Service officials maintained contact with the Abu Labans' counsel and repeated its requests for the surrender of the Abu Labans and a complete medical report on the father. The Abu Labans did not respond to requests.

On September 17, 1982, four weeks after the Abu Labans arrived and three weeks after their parole had expired, they were apprehended in Jersey City, New Jersey. According to the arresting agents' affidavits, when they tried to enter the apartment, the father and one of his sons had to be stopped from leaving through the back door. The officers decided not to risk arresting the father when he produced a typewritten note from Dr. Al-Salihi, dated August 20, 1982, repeating the contents of the handwritten note referred to above.

The Abu Labans were processed at the New York District Office as unadmitted aliens who are excludable from the United States as immigrants not in possession of valid unexpired immigrant visas pursuant to section 212(a)(20) of the Act, 8 U.S.C. § 1182(a)(20).[3] On September 27, 1982, after exclusion hearings were adjourned at the Abu Labans' request, they, along with their father, filed applications for political asylum in the United States and simultaneously requested their release on parole. Parole was denied by the Assistant District Director, acting on behalf of the District Director, who had concluded that the Abu

---

3. 8 U.S.C. § 1182(a)(20) reads as follows:

(a) Except as otherwise provided in this chapter, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States:

(20) Except as otherwise specifically provided in this chapter, any immigrant who at the time of application for admission is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality, if such document is required under the regulations issued by the Attorney General pursuant to section 1181(a) of this title.

As the Government points out, the claim that deportation proceedings, rather than exclusion proceedings, are required must fall. Unadmitted aliens who are paroled into the United States remain unadmitted aliens who can eventually be excluded regardless of their release on parole. Section 212(d)(5)(A) of the Act, 8 U.S.C. § 1182(d)(5)(A); Leng May Ma v. Barber, 357 U.S. 185, 187, 78 S.Ct. 1072, 1073, 2 L.Ed.2d 1246 (1958); Bertrand v. Sava, supra, 684 F.2d at 205 n. 1. Section 212(d)(5)(A) specifically provides:

[P]arole of . . . an alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant to the United States.

Labans posed "a legitimate risk of absconding." The Abu Labans' applications for political asylum are currently being adjudicated.

The Abu Labans argue that the District Director has abused his discretion in denying them parole. Further, they have attempted to demonstrate that the INS acts pursuant to a policy which discriminates against Palestinians. In support of the discrimination claim, counsel for the Abu Labans offers unsworn and unsubstantiated allegations that Palestinians are subjected to "special measures" taken by INS in cooperation with the Federal Bureau of Investigation. According to counsel, this treatment reflects the "recurrence" of an "Operation Boulder," a policy allegedly instituted by former President Richard M. Nixon in 1972 to combat terrorism in the United States. In support of his assertion counsel for the Abu Labans offers a collection of essays entitled "Civil Rights of Arab-Americans: 'Special Measures,'" edited by M.C. Bassiouni, Professor of Law, De Paul University, Information Papers No. 10, January 1974. This court cannot on this evidence find that the INS acts pursuant to a policy that discriminates against persons of Arab origin, particularly in light of the affidavit of the Acting District Director of the New York Office which denies the existence of any such policy:

> [T]he New York District Office of the INS neither maintains nor practices any policy of discrimination towards Palestinian or other Arab nationals—or any or class for that matter—in considering and

adjudicating applications for parole pending final determinations on claims for political asylum.

Therefore, the only question to be addressed is whether the Acting District Director abused his discretion in denying the Abu Labans' parole.

The parole of aliens is a discretionary power vested in the Attorney General. 8 U.S.C. 1182(d)(5).[4] The Attorney General has delegated this power to the INS District Directors who are aided by certain guidelines issued by the Commissioner of the INS pursuant to 8 U.S.C. § 1103 and published as an interim rule in the Federal Register. 47 Fed.Reg. 30,045 (1982) (to be codified in 8 C.F.R. § 212.5).[5]

Our Court of Appeals has set forth the "narrow range of inquiry," *Tobia v. Sava,* 556 F.Supp. 325 (S.D.N.Y.1982), available to this court in reviewing discretionary decisions of the Attorney General:

> [A]s long as the Attorney General exercises his broad discretion . . . his decision may not be challenged on the grounds that the discretion was not exercised fairly in the view of a reviewing court or that it gave too much weight to certain factors . . . and too little to others. Indeed, section 1182(d)(5) permits the Attorney General to deny parole to all or to certain groups of unadmitted aliens on the ground that he finds no emergent or public interest reasons justifying their release on parole. The discretion may not be exercised to discriminate . . . or to depart without rational explanation from established policies . . . But the Attor-

---

4. 8 U.S.C. § 1182(d)(5)(A) reads, in pertinent part, as follows:

> The Attorney General may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, . . . .

5. The guidelines provide that parole decisions should be based on consideration of whether:
> (a) the alien has a serious medical condition;
> (b) the alien is pregnant, or is a juvenile;
> (c) the alien has an eligible parent, spouse, child or sibling who has filed a visa petition on the alien's behalf;

> (d) the alien will be a witness in a judicial, administrative or legislative proceeding, or is subject to prosecution;
> (e) continued detention is against the public interest as determined by the District Director

A final rule became effective November 18, 1982, 47 Fed.Reg. 46,493 (October 19, 1982) (to be codified in 8 C.F.R. § 212.5). The Abu Labans arrived in the United States after the interim rule was in effect. Therefore, their September 27, 1982 applications for parole pending adjudication of their asylum claims were properly considered under the interim rule.

ney General's exercise of his broad discretionary power must be viewed at the outset as presumptively legitimate and bona fide in the absence of strong proof to the contrary.

*Bertrand v. Sava,* 684 F.2d 204, 212–13 (2d Cir.1982) (citations omitted). *See also Olayeni v. I.N.S.,* 82 Civ. 5737 (S.D.N.Y. September 21, 1982); *Paulis v. Sava,* 544 F.Supp. 819 (S.D.N.Y.1982); *Satary v. I.N.S.,* 82 Civ. 3454 (S.D.N.Y. July 2, 1982).

As the Honorable Charles L. Brieant found in *Satary, supra,* "a review of actions of the Acting District Director and the record in this case reveals that the Acting District Director, in denying plaintiff's applications for parole, did exercise the broad discretion delegated to him by the Attorney General." The Acting District Director concluded that the Abu Labans "presently pose a legitimate risk of absconding." The Abu Labans had applied for but were denied immigrant visas in Madrid; they had attempted to enter the country as TRWOV's en route to Mexico but there was little indication that they intended to go there; their father allegedly suffered a heart attack but was released from the hospital hours later; the Service repeatedly requested their appearance and a detailed medical report on their father yet the Abu Labans did not respond; and finally, they have recently filed political asylum applications. This court cannot find that under these circumstances the Assistant District Director abused his discretion in denying parole. *Cf. Satary v. I.N.S., supra* (denial of parole upheld as to three Afghanistan brothers who entered the United States with false documents and were awaiting the adjudication of their political asylum claims). *Compare Olayeni v. I.N.S., supra* (denial of parole upheld as to Nigerian student appealing Immigration Judge's order of exclusion to the INS Board of Immigration Appeals ("BIA")); *Tobia v. Sava, supra* (denial of parole upheld as to Iraqis who arrived in the United States without U.S. visas, applied for political asylum, were denied, found excludable, and appealed to the BIA); *Paulis v. Sava, supra,* (denial of parole upheld as to Iraqi who entered the United States with a false visa, filed for political asylum, was denied and appealed to the BIA).

The Abu Labans have failed to provide the "strong proof" required by *Bertrand, supra,* that the District Director abused his discretion in denying them parole. As such, the petition for habeas corpus relief is denied and the clerk is directed to enter judgment dismissing the petition.

IT IS SO ORDERED.