**Floyd Murray BRUCE, Petitioner,**

v.

**William SLATTERY, District Director of the Immigration & Naturalization Service for the District of New York, Respondent.**

**No. 91 Civ. 5439 (CHT).**

United States District Court, S.D. New York.

Nov. 4, 1991.

Massarro & Livingston (Donn Livingston, of counsel), New York City, for petitioner.

Otto G. Obermaier, U.S. Atty., S.D.N.Y. (James A. O'Brien, III, of counsel), New York City, for respondent.

## OPINION

TENNEY, District Judge.

Petitioner Floyd Murray Bruce, who has been held in the custody of the Immigration and Naturalization Service ("INS") at their detention center in New York City for the past twenty-nine months, brings this petition for habeas corpus under 28 U.S.C. § 2241 (1988). For the reasons discussed below, the petition is denied.

## BACKGROUND

Petitioner Bruce arrived at JFK International Airport on May 30, 1989 on a flight originating in Lagos, Nigeria. Return in Opposition to the Petition for Writ of Habeas Corpus ("R.") at 132. Bruce presented himself to INS inspectors as an alien transiting the United States without a visa ("TRWOV") and produced both a ticket for a continuing flight to Bermuda and a document issued by the Nigerian government entitled "Emergency Certificate." R. 132. The certificate stated that its holder was a "Burmudian" [sic] national who had been issued the certificate "to enable him return [sic] to his country on repatriation." R. 60. Bermudian authorities were contacted, and

they informed the INS that Bruce would not be permitted to enter Bermuda with such a document. Bruce was detained for questioning and, consequently, missed his connecting flight to Bermuda.

Bruce's detention by the INS has now stretched into a two and one half year period of confinement while multiple international efforts have been made to determine his nationality in order to facilitate his deportation. Bruce claims that he was born in Hamilton, Bermuda on October 28, 1963. Memorandum of Law in Support of Petition for Writ of Habeas Corpus at 1 ("Pet. Mem."). Petitioner, however, has been unable to produce a birth certificate from Bermuda, and, so far, no one can locate any official record of his birth. Pet. Mem. at 2. Bruce states that he moved to England with his family in 1970. *Id.* Complicating the efforts to determine Bruce's origins is the fact that Bruce does not have any siblings, and the whereabouts of his father are unknown. *Id.* In addition, Bruce's mother died in England in 1979. *Id.*

According to British criminal records, Bruce had two criminal convictions in England: for possession of cannabis resin and obtaining money by false pretenses. R. 93–94. After serving his sentences for these offenses, Bruce was deported from England to Nigeria. R. 30. According to a London Metropolitan Police report, Bruce was "taken into custody" by the Nigerian authorities upon his arrival there. R. 31. Bruce states that he spent a period of eight months in the custody of Nigerian immigration officials who refused to allow him to enter Nigeria because he was not a Nigerian citizen. First Petition for Writ of Habeas Corpus at 1. Bruce contends that the British government refused to issue him a passport while he was in Nigeria and, as a last resort, the Nigerian government issued an "emergency certificate" which was intended to facilitate Bruce's "repatriation" to Bermuda. Pet. Mem. at 3. On other occasions, however, Bruce has said that he was arrested by Nigerian authorities while attempting to leave Nigeria with some heroin. R. 134. He says that he was tortured by the Nigerian authorities while awaiting trial and that a British passport, which he had stolen and altered by substituting his photograph for that of the rightful owner, was taken from him by the Nigerian authorities.

At the time that the INS took Bruce into custody, it notified him that proceedings to exclude him were being commenced. R. 130. Six weeks later, Bruce was informed by the British Consulate–General that, after a full investigation, it had been determined that Bruce was not a Bermudian citizen and, therefore, was not eligible for a British "Dependent Territories—Bermuda travel document." R. 119. Bruce, however, continued to insist that he was born in Bermuda. R. 115–17. On November 20, 1989, the INS received information from the International Criminal Police Organization ("Interpol") in London, England that Floyd Murray Bruce was also known as "Joseph Ekwensi," and that Ekwensi was a Nigerian and had a criminal record in England. R. 93–95. In addition, on November 21, 1989, the British embassy in Washington, D.C. informed the INS that Bruce had called the Embassy and claimed to be Michael Olusagun Oduyoya, born in London, England on November 19, 1965. R. 89.

On or about October 10, 1990, Interpol London informed the INS that Bruce was not welcome in Britain and that Bruce had been granted a Nigerian travel document by the Nigerian High Commission in England, in order to effect his removal from England to Nigeria on October 28, 1988. R. 27, 30. After Bruce had been deported to Nigeria, he apparently remained there until Nigerian authorities unsuccessfully attempted to deport him to Bermuda in May 1989.

Throughout his lengthy INS detention, Bruce has been the subject of multiple exclusion proceedings, appeals, parole applications, and habeas petitions. During this period, the INS's attempts to determine his citizenship have proved fruitless. For example, on April 10, 1990, the INS contacted the Nigerian Embassy to request that travel documents be issued to Bruce to allow his return to Nigeria. R. 74–75. The Nigerian Embassy, however, informed the

INS that Bruce was not a Nigerian citizen and that no travel documents would be issued.[1] R. 71. Additionally, in the fall of 1990, the British Consulate–General denied that Bruce was a national of either Britain or Bermuda. Finally, on July 19, 1991, the Nigerian Consulate informed the INS that Bruce "claims not to be from Nigeria. Therefore, 'we don't want to get involved.'" R. 153.

Although the INS had not made much progress finding a country willing to accept Bruce, it was making headway in having Bruce formally excluded from the United States. On February 21, 1991, Bruce was ordered excluded and deported from the United States. R. 135. Bruce timely appealed that decision to the Board of Immigration Appeals ("BIA"). R. 138. However, pursuant to an agreement between Bruce and the INS, Bruce agreed to withdraw his appeal to the BIA and his then-pending habeas corpus petition before this court if the INS would give him an opportunity to depart for Bermuda. R. 139–44. On June 5, 1991, Bruce's attorney and the United States Attorney for the Southern District of New York signed a settlement agreement providing that Bruce would be released—with the understanding that he would be given only an opportunity to depart for Bermuda—if he dismissed his BIA appeal and habeas action. R. 139–44; Pet. Mem. at 8–9. On June 13, 1991, Bruce's appeal to the BIA was withdrawn, and the order of exclusion became final. R. 144. *See* 8 C.F.R. § 3.4 (1991).

On June 20, 1991, Bruce was taken to JFK International Airport by the INS for a flight to Bermuda. R. 145–46, 148. Three days later, he was escorted back to JFK Airport by Bermudian authorities, having been refused entry into Bermuda. R. 147. Once again, Bruce was taken into custody, this time pursuant to his final order of exclusion. R. 147. On July 15, 1991, Bruce requested that he be released from INS's custody, claiming that he was not subject to any exclusion proceedings and should, therefore, be given an opportunity

to depart the United States by himself. R. 148–49. That request was denied by the INS on October 7, 1991. In the interim, Bruce brought this second petition for habeas corpus.

## DISCUSSION

### A. *Congressional Power Over the Admissibility of Aliens*

No one denies that Bruce's unanticipated detention in the United States has been protracted and unpleasant. However, it must also be recognized, at the outset, that in the sphere of immigration, "Congress regularly makes rules that would be unacceptable if applied to citizens." *Mathews v. Diaz*, 426 U.S. 67, 80, 96 S.Ct. 1883, 1891, 48 L.Ed.2d 478 (1976). Indeed, "over no conceivable subject is the legislative power of Congress more complete than it is over" the admission of aliens. *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909).

Encompassed within Congress' "plenary power to make rules for the admission of aliens," *Boutilier v. Immigration & Naturalization Service*, 387 U.S. 118, 123, 87 S.Ct. 1563, 1567, 18 L.Ed.2d 661 (1967), is a comparably broad power "to fix the conditions under which aliens are to be permitted to enter ... this country." *Flemming v. Nestor*, 363 U.S. 603, 616, 80 S.Ct. 1367, 1375–76, 4 L.Ed.2d 1435 (1960). Aliens have no constitutional right to be admitted into this country. *Landon v. Plasencia*, 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982); *Kleindienst v. Mandel*, 408 U.S. 753, 762, 92 S.Ct. 2576, 2581, 33 L.Ed.2d 683 (1972). Similarly, as parole is part of the admissions process, its denial does not rise to the level of a constitutional infringement. *Fernandez–Roque v. Smith*, 734 F.2d 576, 581–82 (11th Cir. 1984); *Jean v. Nelson*, 727 F.2d 957, 972 (11th Cir.1984) (*en banc*), *aff'd*, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985). It is against this background of jurispru-

---

**1.** The Nigerian Embassy's decision seems to have been based in part on statements made by Bruce himself that he came upon the Nigerian name "Ekwensi" by intercepting someone else's Social Security check. R. 71.

dence that Bruce brings this petition for habeas corpus to challenge his detention by the INS.

### B. *Indefinite Detention of an Excludable Alien*

■ Petitioner Bruce submits that neither the Constitution nor the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.* (1988) ("Act"), authorizes the indefinite detention of an unadmitted alien. Yet, as pointed out by both petitioner and respondent, the Supreme Court has upheld the indefinite detention of an excludable alien where no other country would accept him. *See Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 216, 73 S.Ct. 625, 631, 97 L.Ed. 956 (1953) (detention at Ellis Island for twenty-one months did not deprive alien of any statutory or constitutional rights). This is because an alien, who is detained pending exclusion, is viewed as not having "entered" this country. He is, in effect, "treated as if stopped at the border." *Id.* at 215, 73 S.Ct. at 631.

Petitioner argues that *Mezei* has been "effectively overruled." Pet. Mem. at 13. The court, however, does not agree. Petitioner bases this argument on the fact that the Supreme Court in *Jean v. Nelson,* 472 U.S. 846, 105 S.Ct. 2992, criticized the Eleventh Circuit for unnecessarily reaching a question of constitutional import. *Id.* at 854, 105 S.Ct. at 2996–97. Because the circuit court had relied on *Mezei* in making its constitutional determination, *see Jean v. Nelson,* 727 F.2d at 967–75, petitioner suggests that the Court's admonition that the Eleventh Circuit should have followed a " 'fundamental rule of judicial restraint' " indicates the Court's discomfort with *Mezei.* *Id.* at 854 (quoting from *Three Affiliated Tribes of Berthold v. Wold Engineering,* 467 U.S. 138, 104 S.Ct. 2267, 81 L.Ed.2d 113 (1984)). However, the Supreme Court's directive that the Eleventh Circuit should have avoided reaching the constitutional question presented in *Jean*—because the issue could have been decided on purely statutory grounds—does not in any way lead to the conclusion that the Supreme Court was disavowing the precedent that the Eleventh Circuit relied upon

in making its determination. In fact, the Supreme Court has never directly criticized *Mezei* nor backed away from its holding. Contrary to petitioner's urging, therefore, the court concludes that *Mezei* is still good law and is applicable to Bruce's case.

■ Alternatively, petitioner urges that the court follow the standard enunciated in *Rodriguez–Fernandez v. Wilkinson,* 654 F.2d 1382 (10th Cir.1981): "When an excludable alien in custody tests the detention by writ of habeas corpus ... we hold that the burden is upon the government to show that the detention is still temporary pending exclusion, and not simply incarceration as an alternative to departure." *Id.* at 1390. But even under this standard the petitioner cannot prevail. The INS has made several attempts to obtain travel documents from the British, Bermudian, and Nigerian authorities. In addition, the INS gave Bruce an opportunity to depart for his desired destination of Bermuda last June in an effort to end his detention. Presently, the INS has requested assistance from the State Department in returning Bruce to Nigeria and is actively investigating the possibility that Bruce may indeed be a citizen of the United Kingdom. Based on these efforts, the court concludes that the Government is detaining Bruce temporarily pending exclusion.

### C. *Review of Decision Not to Parole Petitioner Pending Exclusion*

Bruce's current petition for habeas corpus also challenges the November 27, 1990 and October 7, 1991 refusals of the INS to parole him pending his departure from the United States. Bruce's first parole request was made while exclusion proceedings were still pending against him. Under these circumstances, section 212(d)(5)(A) of the Act provides that "[t]he Attorney General may, ..., in his discretion, parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States,...." 8 U.S.C. § 1182(d)(5)(A). Furthermore, the

regulations promulgated under the Act provide that aliens who have been detained shall be paroled if their continued detention is not in the public interest, "provided that the aliens present neither a security risk nor a risk of absconding." 8 C.F.R. § 212.-5(a)(2) (1991).

The Second Circuit has recognized that Congress vested in the Attorney General "broad discretionary power to parole unadmitted aliens pending a final determination on their application for admission to the United States." *Bertrand v. Sava,* 684 F.2d 204, 212 (2d Cir.1982). Accordingly, the Attorney General's decision "may not be challenged on the grounds that [his] discretion was not exercised fairly in the view of a reviewing court or that [he] gave too much weight to certain factors relevant to the risk of abscondence and too little to others." *Id.* That decision may be overturned only if the Attorney General has acted irrationally or in bad faith, and it is the alien's heavy burden at all times to so establish. *Id.* at 213; *Bedredin v. Sava,* 627 F.Supp. 629, 632–33 (S.D.N.Y.1986); *Ledesma–Valdes v. Sava,* 604 F.Supp. 675, 680 (S.D.N.Y.1985). Thus, "the Attorney General's exercise of his broad discretionary power must be viewed at the outset as presumptively legitimate and bona fide in the absence of strong proof to the contrary." *Bertrand v. Sava,* 684 F.2d at 212–13; *Fernandez–Roque v. Smith,* 734 F.2d 576, 583 (11th Cir.1984); *Ledesma–Valdes v. Sava,* 604 F.Supp. at 680; *Tobia v. Sava,* 556 F.Supp. 325, 327 (S.D.N.Y. 1982); *see also Wing Wong Hang v. Immigration & Naturalization Service,* 360 F.2d 715, 718 (2d Cir.1966) (abuse of discretion arises only when no reasonable man would take the view under discussion).

Given Bruce's repeated misrepresentations of his identity and nationality, it was not unreasonable for the INS to conclude that he might abscond. R. 8. The court concludes, therefore, that the INS did not abuse its discretion when it denied him parole on November 27, 1990.

Bruce's second parole request was made after he was refused admission by Bermuda and was returned to the United States. As noted by the Assistant District Director who adjudicated Bruce's parole requests, Bruce was still subject to his final order of exclusion because that order had not been successfully executed. R. 150. *See also* 8 C.F.R. § 212.5(d)(2)(i) (1991). Upon concluding that Bruce was subject to a final order of exclusion, the INS was entitled to detain him, pursuant to 8 C.F.R. § 237.2 (1991), which provides that: "[a]n alien who has been finally excluded pursuant to Part 236 of this chapter ... shall surrender himself to such custody [of the Service] upon notice in writing of the time and place for his surrender. The Service may take the alien into custody at any time." Furthermore, 8 C.F.R. § 212.-5(d)(2)(i) provides that "any order of exclusion and deportation previously entered shall be executed. If the exclusion order cannot be executed by deportation within a reasonable time, the alien shall again be released on parole unless in the opinion of the district director the public interest requires that the alien be continued in custody." Because Bruce was rejected by Bermuda and was not given any travel documents by the Nigerian Consulate in the United States, his order of exclusion could not be executed within a reasonable time. Therefore, Bruce fell within the scope of 8 C.F.R. § 212.5(d)(2)(i), allowing continued custody if the director decides such custody is in the public interest.

Once again, the director did not abuse his discretion in finding that the public interest required the continuation of Bruce's custody. First, the INS has been unable to determine Bruce's true identity or nationality. Discussing the relevance of an alien's identity to the likelihood of his absconding, the Second Circuit reasoned that " '[d]ocumentation' is relevant on the absconding issue because the existence of valid travel documents permits the INS to determine an alien's identity and it is much more difficult for an accurately identified alien to abscond while paroled." *Bertrand v. Sava,* 684 F.2d 204, 217 n. 16 (2d Cir.1982). In addition, Bruce's incentive to abscond is even greater now than when he made his first parole request in October 1990 be-

cause he is now subject to a final order of exclusion. See id.; *Tobia v. Sava*, 556 F.Supp. at 326 n. 2 (court finds little logic in contention that once unadmitted alien is found excludable, he should be given more freedom than when his excludability was still open to question). Moreover, given Bruce's demonstrated resistance to the INS's efforts to return him to Nigeria, it is obvious that his potential deportation to that country presents another reason for him to abscond. In light of these circumstances and the public interest in preventing an alien subject to a final order of exclusion from absconding, the court finds that the INS did not abuse its discretion in denying Bruce's October 7, 1991 request for parole.

## CONCLUSION

Bruce's petition for habeas corpus is denied without prejudice. Bruce may renew his petition if the INS has not succeeded in deporting him by January 9th, 1992.

So ordered.